******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## BAYWING, LLC *v.* WATER POLLUTION CONTROL AUTHORITY OF THE TOWN OF WILTON
### (AC 48201)

Cradle, C. J., and Westbrook and Norcott, Js.

*Syllabus*

The defendant appealed from the trial court's judgment sustaining the plaintiff's appeal from the defendant's decision denying the plaintiff's application to connect to the town of Wilton's sewer system, to construct an extension of the sewer system to the plaintiff's property, and to allocate sewer use capacity for the property. The defendant claimed, inter alia, that the court improperly determined that the defendant abused its discretion in denying the plaintiff's application. *Held*:

The trial court's decision to sustain the plaintiff's appeal was not arbitrary or an abuse of its discretion, as the defendant's stated reasons for its denial of the plaintiff's application were not based on reliable evidence or supported by substantial evidence in the record, and the plaintiff was not afforded the opportunity to respond to the concerns of the defendant.

Argued October 20, 2025—officially released May 26, 2026

*Procedural History*

Appeal from the decision of the defendant denying the plaintiff's application to, inter alia, connect to the town of Wilton sewer system, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the judicial district of Hartford, Land Use Litigation Docket, where the case was tried to the court, *O'Hanlan, J.*; judgment sustaining the plaintiff's appeal, from which the defendant, on the granting of certification, appealed to this court. *Affirmed*.

*Peter V. Gelderman*, for the appellant (defendant).

*Timothy S. Hollister*, with whom was *Andrea L. Gomes*, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. The defendant, the Wilton Water Pollution Control Authority,[1] appeals from the judgment

[1]The defendant is the agency authorized under General Statutes § 7-245 et seq. to oversee and administer the public sewer system in the town of

of the trial court sustaining the appeal of the plaintiff, Baywing, LLC, from the defendant's decision to deny the plaintiff's application to connect to the town of Wilton (town) sewer system, to construct an extension of the sewer system to the subject property located at 19 Cannon Road, and to allocate sewer use capacity for the subject property. The court remanded the matter to the defendant with direction to approve the three aspects of the plaintiff's application with appropriate conditions that had been discussed previously and accepted by the plaintiff. On appeal, the defendant claims that the court, by sustaining the appeal and ordering a conditional approval of the plaintiff's application, improperly (1) substituted its own judgment for that of the defendant, (2) determined that the defendant abused its discretion in denying the plaintiff's application, and (3) determined that the proceedings before the defendant were fundamentally unfair. We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts and procedural history. The plaintiff has an option to purchase the subject property, which is a 2.16 acre lot located in a residential zone in the Cannondale Village area of the town and near the Cannondale Train Station. The subject property has been identified in the town's plan of conservation and development for sewer expansion. The plaintiff seeks to convert the existing single-family residence on the subject property into a multifamily development with seventy units,[2] a portion of which would be preserved for moderate income households.[3] The subject property

Wilton. It has adopted rules and regulations for sewer connections and use and its oversight of the sewer operations, cost, and maintenance.

[2]The plaintiff's application indicated that the development would consist of thirty-eight one bedroom units and thirty-two two bedroom units.

[3]We note that, although our legislature has long recognized that affordable housing is a matter of substantial public interest, it has not explicitly extended affordable housing requirements and considerations to the powers granted to water pollution control authorities. *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 431–32, 853 A.2d 497 (2004). "Consequently, we conclude that the legislature has not required water pollution control authorities to treat applications

is not presently connected to the town's sewer system[4] but, instead, uses a private in-ground septic system.

On September 1, 2022, the plaintiff, pursuant to General Statutes § 7-246a,[5] applied to the defendant to connect the subject property to the town's public sewer system;[6] to extend the sewer from the sewer main in Route 7 to the subject property, a distance of approximately 300 feet; and to be allocated a specific portion of the sewer system's total capacity to handle the estimated sewage generated from the proposed development at the subject property.[7] The defendant accepted the application and, after a brief presentation by the plaintiff's counsel, referred it to the Wilton Planning and Zoning

related to developments with affordable housing components differently from applications for other types of developments, as it has with other municipal bodies." Id., 432–33; see also *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, 193 Conn. App. 823, 839, 220 A.3d 183 (2019), cert. granted, 334 Conn. 916, 222 A.3d 103 (2020), and cert. granted, 335 Conn. 944, 237 A.3d 730 (2020) (appeals withdrawn July 20, 2021).

[4]The court noted that the town has an agreement to send all of the town's sewer discharge to a treatment facility in Norwalk. Pursuant to that agreement, the city of Norwalk "has the right to receive notice about, and to review, proposed connections in Wilton that will impact sewer discharges to Norwalk's sewer system."

[5]General Statutes § 7-246a provides in relevant part: "(a) Whenever an application or request is made to a water pollution control authority or sewer district for (1) a determination of the adequacy of sewer capacity related to a proposed use of land, (2) approval to hook up to a sewer system at the expense of the applicant, or (3) approval of any other proposal for wastewater treatment or disposal at the expense of the applicant, the water pollution control authority or sewer district shall make a decision on such application or request within sixty-five days from the date of receipt, as defined in subsection (c) of section 8-7d, of such application or request. The applicant may consent to one or more extensions of such period, provided the total of such extensions shall not exceed sixty-five days. . . ."

[6]"Where the property involved in a project is near a municipal sewer, the Sewer Authority also known as the Water Pollution Control Authority in some municipalities will review it and determine the requirements for a sewer hookup." D. Merriam, 9 Connecticut Practice Series: Land Use Law and Practice (2026 Ed.) § 14.10, p. 555.

[7]This application was made pursuant to §§ 2 and 3 of the defendant's regulations.

Commission (commission) pursuant to General Statutes §8-24.[8] The commission reviewed the plaintiff's application and returned a negative report, dated October 25, 2022, to the defendant.[9]

The defendant considered the plaintiff's application at its November 3, 2022 meeting. At this meeting, the parties discussed, inter alia, issues regarding the capacity of the eight inch sewer main in Route 7 and the ownership and maintenance of the pump station and force main.[10] Additionally, the plaintiff agreed to a statutory extension of sixty-five additional days for the defendant to reach a decision on its application.[11]

The defendant next considered the plaintiff's application at its January 12, 2023 meeting, where matters regarding ownership of the pump station and the force main were discussed further, along with the capacity of the eight inch sewer main in Route 7. Members of the defendant expressed concern regarding the plaintiff's application specifically pertaining to the capacity and ownership issues. The defendant, on the advice of counsel, agreed to continue the matter until the next meeting on January 19, 2023.

At the outset of the January 19, 2023 meeting, the chairperson of the defendant acknowledged the receipt of a letter from the plaintiff's counsel, dated January

[8]General Statutes §8-24 provides in relevant part: "No municipal agency or legislative body shall . . . (4) locate or extend public utilities and terminals for water, sewerage, light, power, transit and other purposes, until the proposal to take such action has been referred to the commission for a report. . . ."

[9]We note that a report issued pursuant to a §8-24 referral is purely advisory and is not subject to an appeal. *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission*, 266 Conn. 338, 359, 832 A.2d 611 (2003); see also *McCarthy* v. *Planning & Zoning Commission*, Superior Court, judicial district of Hartford, Docket No. CV-22-5072843-S (May 11, 2023).

[10]During the November 3, 2022 meeting, the town engineer explained that "a gravity line is a pipe that's sloped downhill so that the effluent just flows naturally down a pipe versus a force main where you have a pump station pumping effluent in a pipe that's going uphill."

[11]See footnote 5 of this opinion.

18, 2023, that proposed certain conditions of approval to resolve the ownership issue pertaining to the pump station and force main and clarified, for further discussion, issues regarding the sewer main capacity. The chairperson of the defendant then read a resolution to deny the plaintiff's application that had been sent to some, but not all, of the members of the defendant. The substance of the plaintiff's January 18, 2023 letter was not discussed. By unanimous vote, the members of the defendant denied the plaintiff's application. In a document dated January 27, 2023, the defendant articulated eight factual findings and provided the following five reasons as its collective statement[12] for denying the plaintiff's application:

"1. The [t]own should not own a private pump station servicing only one property.

"2. The [plaintiff] should not own the force main.

"3. The force main and private pump station should be owned, operated, repaired and maintained by a single entity, therefore an extension of the sewer should not be approved until the pump station serves more than a single property and is under control of the [t]own.

"4. The current project precludes any other development that would require access to the existing Route 7 main line as capacity will have been reached.

"5. It would be inequitable and unfair to other property owners who may seek approvals to connect to the sewer (where no sewer extension is required) who have or may have a reasonable expectation of access to the sewer."

---

[12]"Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The principle that a court should confine its review to the reasons given by a zoning agency . . . applies where the agency has rendered a formal, official, collective statement of reasons for its action." (Internal quotation marks omitted.) *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, 189 Conn. App. 332, 336–37, 207 A.3d 1053 (2019).

The plaintiff filed an appeal from the defendant's decision to the Superior Court on February 14, 2023.[13] In a decision dated May 24, 2024, the court, *O'Hanlan, J.*, sustained the plaintiff's appeal. The court determined that most of the defendant's findings and reasons for its denial of the plaintiff's application were not supported by substantial evidence. Additionally, the court explained that, even applying the broad deference required by controlling precedent, the defendant's decision was arbitrary and an abuse of its discretion. Finally, the court concluded that "the defendant's conduct [at] its last meeting [on January 19, 2023], in which it denied the plaintiff's application, lacked fundamental fairness." In reaching this conclusion, the court noted that, at the January 12, 2023 meeting, the defendant had agreed to keep the proceedings open until the January 19, 2023 meeting so as to allow the plaintiff's counsel to address the opposition to the application before the defendant voted on it, but this did not happen. Ultimately, the court sustained the plaintiff's appeal and remanded the matter to the defendant to approve the three aspects of the plaintiff's application, namely, connection, extension, and capacity, with appropriate conditions of approval as the parties had discussed previously and the plaintiff had accepted.[14] This court subsequently granted the

[13]See General Statutes § 7-246a (b); see also D. Merriam, 9A Connecticut Practice Series: Land Use Law and Practice (2026 Ed.) § 44:7, pp. 642–43 (appeals are allowed from decisions of municipal water pollution control authority under General Statutes § 8-8); see generally *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, 193 Conn. App. 823, 833 n.10, 220 A.3d 183 (2019), cert. granted, 334 Conn. 916, 222 A.3d 103 (2020), and cert. granted, 335 Conn. 944, 237 A.3d 730 (2020) (appeals withdrawn July 20, 2021).

[14]"A municipal land use or related administrative agency generally may conditionally approve an application submitted for its consideration provided that the conditions imposed 'are within the scope of the agency's statutory authority and are an attempt to implement its existing regulations for a specific project on which the agency acts in an administrative capacity.' R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 22:16, p. 721." (Internal quotation marks omitted.) *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, 193 Conn. App. 823, 837, 220 A.3d 183 (2019), cert.

defendant's petition for certification to appeal, and this appeal followed.

On appeal, the defendant claims that, in sustaining the plaintiff's appeal, the court improperly substituted its own judgment for that of the defendant. In support of this claim, the defendant argues that the trial court improperly discredited the testimony of the town engineer and "effectively prais[ed] the testimony of the plaintiff's engineer [from LandTech]." The defendant also asserts that the court made findings not supported by the record and improperly concluded that the issues identified by the defendant regarding ownership of the pump station and force main were arbitrary and an abuse of its discretion and therefore were not valid reasons for the denial of the plaintiff's application. Finally, the defendant contends that, contrary to the conclusion of the trial court, the proceedings before the defendant, specifically, the events from the end of the January 12, 2023 meeting to the January 19, 2023 meeting, were fundamentally fair, as the plaintiff was not denied a "full opportunity" to present its case.

The plaintiff counters that the court properly determined that the defendant's denial of its application on the bases of capacity and ownership of the pump station and force main was arbitrary and amounted to an abuse of its discretion. Additionally, it claims that the defendant overstated the discretion it claims it was entitled to and that, given the flaws in the actions of the defendant with regard to the plaintiff's application, the trial court's decision to sustain the plaintiff's appeal did not constitute a substitution of its judgment for that of the defendant. As to the court's determination of a denial of fundamental fairness, the plaintiff relies on the analysis set forth in the memorandum of decision. In conclusion, it maintains that the "court methodically and meticulously reviewed the record and concluded that the [defendant's] denial was not supported by substantial evidence and was

granted, 334 Conn. 916, 222 A.3d 103 (2020), and cert. granted, 335 Conn. 944, 237 A.3d 730 (2020) (appeals withdrawn July 20, 2021).

therefore arbitrary and an abuse of discretion." After a thorough and careful review of the record presented to us in this appeal, we agree with the court's conclusion that the defendant's denial of the plaintiff's application was arbitrary and an abuse of its discretion and, accordingly, affirm the judgment rendered in this matter.[15]

As an initial matter, we begin by setting forth the relevant principles of law, including our standard of review. "[W]ater pollution control authorities are quasi-municipal corporations created pursuant to statute that may exercise the power to acquire, construct, maintain, supervise, manage and operate a sewer system and perform any act pertinent to the collection, transportation and disposal of sewage. . . . In defining the powers and duties of such authorities, [General Statutes] § 7-247 (a) provides, inter alia, that they may establish and revise rules and regulations for the supervision, management, control, operation and use of a sewerage system, including rules and regulations prohibiting or regulating the discharge into a sewerage system of any sewage or any stormwater runoff which in the opinion of the water pollution control authority will adversely affect any part or any process of the sewerage system . . . .

"Accordingly, [i]n considering an application for sewer service, a water pollution control authority performs an administrative function related to the exercise of its powers. . . . When a water pollution control authority performs its administrative functions, a reviewing court's standard of review of the [authority's] action is limited to whether it was illegal, arbitrary or in abuse of [its] discretion . . . . Moreover, there is a strong presumption

___

[15]As a result of this conclusion, we need not address in detail the defendant's claims that the trial court improperly substituted its judgment for that of the defendant or that the court improperly concluded that the January 19, 2023 meeting was conducted in violation of fundamental fairness. With respect to the former, we conclude that the court engaged in a proper review of the defendant's denial of the plaintiff's application and concluded that said denial was improper. As to the latter, we note our agreement with the statements of the court regarding the events that occurred at the January 19, 2023 meeting.

of regularity in the proceedings of a public agency, and we give such agencies broad discretion in the performance of their administrative duties, provided that no statute or regulation is violated. . . .

"With respect to factual findings, a reviewing court is bound by the substantial evidence rule, according to which, [c]onclusions reached by [the authority] must be upheld by the trial court if they are reasonably supported by the record. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [authority] supports the decision reached. . . . If a trial court finds that there is substantial evidence to support a [water pollution control authority's] findings, it cannot substitute its judgment as to the weight of the evidence for that of the [authority]. . . . If there is conflicting evidence in support of the [authority's] stated rationale, the reviewing court . . . cannot substitute its judgment for that of the [authority]. . . . The [authority's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . Accordingly, we review the record to ascertain whether it contains such substantial evidence and whether the decision of the defendant was rendered in an arbitrary or discriminatory fashion. . . . We review the court's decision to determine if, when reviewing the decision of the administrative agency, it acted unreasonably, illegally, or in abuse of its discretion. . . .

"As our Supreme Court has emphasized, water pollution control authorities are afforded broad discretion in deciding whether to provide sewer service to property owners, but cannot exercise that discretion in an arbitrary or discriminatory manner . . . . Only if it appears that a public agency reasonably could have reached only one conclusion is it proper for a court to direct that agency to do that which the conclusion requires." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, 193 Conn. App. 823, 835–37,

220 A.3d 183 (2019), cert. granted, 334 Conn. 916, 222 A.3d 103 (2020), and cert. granted, 335 Conn. 944, 237 A.3d 730 (2020) (appeals withdrawn July 20, 2021); see also *Forest Walk, LLC* v. *Water Pollution Control Authority*, 291 Conn. 271, 286, 968 A.2d 345 (2009); *Landmark Development Group, LLC* v. *Water & Sewer Commission*, 184 Conn. App. 303, 316–17, 194 A.3d 1241, cert. denied, 330 Conn. 937, 195 A.3d 385 (2018), and cert. denied, 330 Conn. 937, 195 A.3d 386 (2018); see generally D. Merriam, 9 Connecticut Practice Series: Land Use Law and Practice (2026 Ed.) § 12:4, pp. 486–91.

In order to address the claims raised in this appeal, it is necessary to set forth a comprehensive review of the proceedings before the defendant, as well as the conclusions reached by the court. Furthermore, in order to place these events in the proper context, we also must include details pertaining to two events that preceded the plaintiff's application as recounted by the court. First, "[i]n June 2011, the defendant approved a sewer extension sought by Cannondale Properties, LLC, for a mixed residential and retail use redevelopment for Cannondale Village on the east side of the railroad. . . . This sewer extension ran along the same path as that proposed by the plaintiff, beginning farther east at Cannondale Village, then underneath the railroad tracks and west on Cannon Road, to connect to the sewer in Route 7. . . . Due to rising elevation from east to west, the extension in 2011 was similar to the plaintiff's here, meaning designed as a force main from a pump station to an elevation peak, and then as a gravity line down the west portion of Cannon Road to the existing eight inch sewer main along Route 7. . . .[16] *This sewer extension was never installed nor . . . was the development pursued.*

"Cannondale Village's 2011 application materials and the defendant's June 8, 2011 meeting minutes approving

[16]The minutes from the defendant's June 8, 2011 meeting provide the following description of the Cannondale Village proposed project: "Mr. Block of Tighe & Bond showed drawings to the members of the [defendant] illustrating the proposed sewer connection. Mr. Thurkettle explained that the developer of the property in Cannondale Village

it show approval of a sewer extension with an estimated discharge of [16,027] gallons per day [using the 2022 standard of 150 gallons per day per bedroom instead of the 2011 standard of 100 gallons per day per bedroom]. . . . Similar to what the plaintiff sought and agreed to in the present application, the approval included conditions of approval that costs of installation were to be paid by the applicant, responsibility for maintenance would be divided between the town for the gravity line and the applicant for the force main and the pump station, and the developer would post a cash indemnity bond to secure performance of its maintenance obligations." (Citations omitted; emphasis added; footnote added.)

The second significant event preceding the present application occurred in February 2022, when the plaintiff applied to the defendant seeking a sewer connection, extension, and capacity approval for the same redevelopment project that is the subject of this appeal. The plaintiff withdrew its February 2022 application after it had been referred to, but not acted on by, the commission pursuant to §8-24.[17] As part of the February 2022 application, the engineering analysis performed by LandTech on behalf of the plaintiff, at the request of the Wilton town engineer (town engineer), was revised to include

wants to put in a pump station on the property and run a force main under the railroad tracks all the way to a gravity sewer that will go across Route 7. Mr. Thurkettle and Mr. Ahern's recommendation, and one that Chairman Brennan concurs with, is to accept only the [eight inch] gravity sewer that runs from the west side of Route 7 to the east side of Route 7 and Cannon Road as the public sewer, everything else would be a private force main sewer. . . . [The defendant approved a motion granting permission to the developer to connect to the sewer system, along with the following conditions.] The Developer will install the whole system at his cost and once it's completed the Town will be responsible for the gravity portion of the system and the Developer will be responsible for the maintenance on the force main portion of the sewer system. This is conditional upon the Developer notifying future owners of a capital assessment and user fees as required by the [defendant]. It is also conditional upon the Developer establishing a maintenance bond for the force main portion of the sewer in an amount acceptable to the Town Engineer."

[17] See footnote 9 of this opinion.

the estimated flow calculations from the proposed and approved but never completed 2011 Cannondale Village project in determining whether the eight inch pipe had sufficient capacity.[18] LandTech determined that, even with the existing flow, the allocated flow from the 2011 Cannondale Village project, and the proposed flow from the plaintiff's redevelopment project, the total design flow would be 0.61 cubic feet per second (cfs), which was "0.14 cfs less than the 0.75 cfs capacity of the eight inch pipe. . . . LandTech, therefore, concluded that the existing [eight inch] pipe can accommodate the flow without [overflow], even if both pump stations discharge at the same time." (Citations omitted; footnote omitted; internal quotation marks omitted.) Additionally, the town engineer indicated that the plaintiff would assume responsibility for the pump station and the force main, meaning the portion of the sewer running uphill from the property to the peak in Cannon Road. Finally, a senior engineer from the city of Norwalk stated that he had reviewed the plans submitted by the plaintiff and he had " 'no comments' " on them.[19]

On September 1, 2022, the plaintiff filed the present application with the defendant. As part of its application, the plaintiff included a sewer pipe capacity analysis completed by LandTech. Using the standard for residential use of 150 gallons per day per bedroom, LandTech calculated the flow from the proposed seventy unit development at full occupancy at approximately 15,300 gallons per day. Further, LandTech measured the existing sewer flow from an assisted living facility that discharged into the Route 7 sewer main to be 115.3 gallons per minute. It then added the actual flow from the assisted living facility to the estimated flows from the 2011 proposed Cannondale Village project and the plaintiff's project to conclude that the proposed total design flow was 0.61

[18]Specifically, the letter from the town engineer to LandTech stated in relevant part: "Design Engineer shall incorporate the flows from the proposed development (Cannondale Village) into the calculations to determine if the existing [eight] inch pipe has capacity."

[19]See footnote 4 of this opinion.

cfs, which was less than the 0.75 cfs capacity of the eight inch sewer pipe in Route 7.[20] The court adeptly observed that, "[*w*]*ithout the theoretical component* [specifically, the estimated flow from the 2011 Cannondale Village project that was never built], *the plaintiff's real total design flow would have been 0.445 cfs. This is significant*." (Emphasis added.)

The defendant, after a brief presentation from the plaintiff's counsel, accepted the plaintiff's application at its September 14, 2022 meeting. The defendant then considered the plaintiff's application at its November 3, 2022 meeting. A few days before this meeting, the town engineer sent a letter to the defendant setting forth general and technical concerns regarding the plaintiff's application. This letter also included a report from Wright-Pierce, an engineering firm that reviewed the plaintiff's application at the request of the town. During the meeting, the town engineer presented details from his letter and the Wright-Pierce report. He explained that, according to the application, the pump station would be located on private property and would be privately owned, and he did not consider it in the town's best interest "to not have control over the pump station and then to have ownership of the force main . . . ." Citing to the Wright-Pierce report, the town engineer noted that the

[20]The application included a memorandum from LandTech setting forth technical data regarding the project. "The project is expected to generate approximately 15,000 [gallons per day] of wastewater. In addition, this evaluation assumes that an additional 15,000 [gallons per day] will be generated from the future Cannondale Village project. The total daily discharge from the two projects is therefore 30,000 [gallons per day]. The peak instantaneous discharge, assuming both projects pump stations are operating at the same time would be 80 [gallons per minute] each or 160 [gallons per minute] total. . . . The proposed new flow . . . added to the existing 115.3 [gallons per minute] results in a peak flow to the [eight inch] pipe of 275.3 [gallons per minute] or 0.61 cfs. The capacity of an [eight inch] pipe at minimum slope is 0.75 cfs or 337 [gallons per minute]. . . . We conclude, therefore, that the [eight inch] pipe has adequate capacity for its entire length . . . to accept the proposed additional flows. . . . In my professional opinion, the existing public sewer system can safely accommodate the proposed connection and added flow."

plaintiff's application did not account for infiltration and inflow with respect to the additions to the sewer pipes as "you have to allow for some potential groundwater to enter the system and that takes up a little bit of capacity." He suggested that 0.01 cfs be added to the capacity calculations. The Wright-Pierce report observed that, in the plaintiff's analysis, "there appears to be no allowance for any reserved capacity for additional future connections in the area besides the proposed development and the previously proposed and approved Cannondale [Village]. The 80 gpm [(gallons per minute)] allowance for Cannondale [Village] utilized in the analysis does act as a reserve capacity for any other future developments in the area, but was part of an approved development, and may not be available for other future connections." The town engineer explained that the eight inch pipe in Route 7 was "the restrictor" and future developments would necessitate an upgrade to the size of this pipe.

An engineer from LandTech then addressed the defendant. With regard to the suggested infiltration and inflow amount, he agreed that this minimal amount should be included in his revised capacity calculation. He further stated that additional capacity would be available even if the Cannondale Village project eventually was built. A discussion ensued regarding how to identify and mark the underground utilities in the event that digging at the privately owned pump station was necessary. Finally, he indicated that issues regarding maintenance and repairs of privately owned pump stations and force mains that connect to a public sewer exist and typically are addressed in a formal agreement between the town and the owner.

The chairperson of the defendant asked the town engineer why the proposed flow from the Cannondale Village project was included in the capacity calculation for the plaintiff's application. The town engineer responded that, although he did not know the reason why that project never was completed, based on its approval, the allocated flow for this project needed to be included with the plaintiff's application. The town's attorney indicated

that he needed to "look at the approval and see if there are any conditions associated with it or exactly what was approved and that was ten years ago . . . . It had a time limit on it." The plaintiff's attorney opined that the 2011 approval no longer remained valid and remarked that this amount was included in its application to be "conservative in our [capacity] calculation." The chairperson of the defendant indicated that she wanted clarification of this matter for the next meeting, which was scheduled for January 12, 2023.

In a memorandum dated December 22, 2022, LandTech, after discussions with the town engineer and an engineer from Wright-Pierce, revised its calculation of the sewer capacity and the design of the sewer extension. It proposed that, in the event that another property connected to this sewer system, the town would assume ownership of the pump station and holding tanks, which would provide for the emergency storage of wastewater for up to twelve hours if the force main failed. Until ownership was transferred to the town, the plaintiff would establish, and replenish when necessary, a bond to pay for maintenance and repairs. It was proposed further that an agreement regarding maintenance of the force main on Cannon Road be made as a condition of approval. As to the issue of capacity, LandTech's revised calculations incorporated the various modifications to the plaintiff's application. LandTech ultimately concluded that sufficient capacity existed, even with future development. Specifically, the revised pipe capacity calculation was determined to be 0.67 cfs, which was less than the 0.75 cfs maximum capacity of the eight inch main in Route 7.

On January 11, 2023, the town engineer, with the assistance of Wright-Pierce, sent a memorandum to the plaintiff addressing the proposed changes from LandTech. As to the capacity issue, this memorandum noted that 0.67 cfs amounted to approximately 90 percent of the capacity of the eight inch sewer main. Furthermore, it opined that "[a]ny future development beyond this application will likely require upgrades to the existing [eight inch]

pipe on Route 7." The next day, the plaintiff, through its attorney, sent an email in advance of the meeting scheduled for that evening indicating that it would accept numerous suggestions detailed in the January 11, 2023 memorandum. As to the issue of the ownership of the force main and pump station, the email stated: "[The plaintiff] will accept whatever the [defendant] and your office decide is better." (Internal quotation marks omitted.) The email further stated that the plaintiff would be prepared to discuss issues regarding the pipe capacity.

At the January 12, 2023 meeting, the plaintiff's counsel provided a summary of the events pertaining to the application. A LandTech engineer then addressed the issue of capacity relating to the eight inch sewer pipe. He stated that, under his calculations, which included the theoretical flow from the Cannondale Village project that had not been built, another thirty houses could access the pipe before full capacity would be reached. He further stated that, under the present calculations, there was no risk of an imminent overflow. As to the ownership of the pump station, he offered two suggestions. First, the town eventually would assume ownership, but, in the interim, the plaintiff would post a bond to cover any issues. In the alternative, the pump station would remain in private ownership. Ultimately, the LandTech engineer again indicated that the plaintiff would accept whatever solution the town thought was best.

The town engineer then responded to the comments made by the LandTech engineer. He first questioned whether an additional thirty homes could connect to the existing sewer pipe in this area if the plaintiff's redevelopment occurred. Next, he indicated that there would be no issues with the town owning the gravity line portion of the plaintiff's proposal. He then expressed his concern with the town owning the force main without also owning the pump station. He further stated that, if the plaintiff posted a bond to ensure the maintenance of the pump station, an agreement to that effect would need to be in place. The town's attorney responded to a

question from a member of the defendant that such an agreement would be recorded and part of the deed.

After discussing other matters, the town engineer again addressed the capacity of the eight inch pipe, stating: "When I look at 90 percent, that pipe is full. There are towns—I know Norwalk, they don't allow anyone [else to connect] beyond I think it's 75 percent . . . . So, in my mind any future development beyond this application will likely require upgrades to the existing eight inch pipe on Route 7. If another developer proposed to tie into the line I wouldn't be able to concur and allow them to connect but there would have to be upgrades into that eight inch line. . . . If a single-family house wanted to connect into the line, that's different. I don't know if I agree that thirty single-family houses could connect. So, that's my opinion. That's my opinion to the [defendant]."

In response to questions from a member of the defendant, the town engineer indicated that he could not recommend using the standard of 75 percent capacity with respect to the plaintiff's application because the town and the defendant did not have that specific policy in effect. He explained that he was "nervous" at 90 percent capacity and that he would not "go above" that threshold. Later, the town engineer stated that the defendant, by acting on the plaintiff's application, was setting, in effect, the policy on the acceptable limits of pipe capacity. The town engineer, after conceding that he had not completed a survey of the capacity limits used by other towns, continued to express his concerns and stated specifically that "90 percent is really a high number." He did not, however, offer any specifics or standards to support his opinion.

The plaintiff's counsel was asked to respond to the comments from the town engineer. He first noted that the plaintiff had received the detailed comments from the town engineer and Wright-Pierce only one day before the January 12, 2023 meeting. The plaintiff's counsel also informed the defendant that most of the comments from the town engineer and Wright-Pierce were acceptable to

the plaintiff. He specifically indicated, in regard to the issue of ownership of the pump station and force main, that the plaintiff would agree to whatever the defendant decided was the appropriate course of action, including requiring the plaintiff to post a maintenance bond. The plaintiff's counsel then turned to the pipe capacity issue. He noted that, prior to this meeting, there was no discussion of a standard of 90 or 75 percent and that discussions of future requests to connect or access the sewer constituted nothing more than speculation. Further, he suggested, as often has been done in these matters, that a detailed letter setting forth conditions for approval would allow the project to proceed while protecting the interests of the town.

A discussion between the members of the defendant and the defendant's counsel ensued. The defendant's counsel confirmed that there was no reason "that an approval can't be conditioned upon an acceptable agreement to be negotiated. . . . [T]hat happens often and especially in [the] land use areas where there are private agreements, you know, for easements or whatever it might be. Could be drainage, could be other things and the town has been a party to those—towns are party to those all the time. They're negotiated postdecision as a condition of approvals. . . . [F]rom my perspective, that's not problematic." The town engineer then interjected that he was "[not] good" with the pump station and the force main being owned by the plaintiff. The plaintiff's counsel opined that it was "not realistic" for all of the details to be fully negotiated at this point.

The town engineer subsequently stated: "So, I think it's bad practice that the town owns a force main without owning a pump station. They're connected, they're married but I don't think [the town] should own a pump station that's serving one property and I don't think the [plaintiff] has the ability to maintain the force main on Cannon Road. Main reason being is that when the contractor is working on Cannon Road, the owner of a line has three days to mark out the lines to inspect the work

that's happening around the force main. I don't think you can solve that by just an agreement that will get done later. That isn't good engineering practice." This was the first time that the town engineer expressed his concern that the town should not own a pump station that served only a single property. The plaintiff's engineer disagreed that this problem was not amenable to resolution by a subsequent approval condition.

A member of the defendant inquired whether the town engineer would have a different opinion on ownership of a pump station that serviced more than one property. His response was as follows: "So, I mean if two properties—if two properties were to connect into that, you know, [the town] would own the pump station. [The town] ha[s] the ability to own a pump station. [The town] ha[s] the ability to maintain a pump station. [The town] ha[s] complete control over how often it's maintained, how often is it cleaned . . . ." Later, the chairperson of the defendant agreed with the town engineer that it was "bad policy" for the town to own a pump station that serviced only one property.

The members of the defendant then discussed the merits of the plaintiff's application and indicated their inclination to deny it on the basis of the capacity and ownership issues. The defendant's counsel then suggested the drafting of a resolution denying the plaintiff's application, in order to state clearly the specific reasons for doing so, and that this written resolution would be voted on at a subsequent meeting. The defendant's counsel then proposed the following: "Once a resolution is drafted and sent out to [the] members of the [defendant], [the plaintiff's counsel should] also get a copy of it and then if he has any comments at that meeting on [January 19, 2023], he as the applicant would be able to make them." The members of the defendant then unanimously agreed to hold a special meeting on January 19, 2023.

The plaintiff's counsel submitted a letter, dated January 18, 2023, to the defendant. It began by noting that, at the January 12, 2023 meeting, the plaintiff had believed

that technical issues concerning its application had been resolved or could be addressed by way of conditions of approval. Further, the letter noted the plaintiff was "surprised" by the concerns raised by the town staff and indicated that several mistakes or misunderstandings needed correction. Specifically, it provided that, in a letter dated January 6, 2023, Wright-Pierce expressly stated that ownership and maintenance issues pertaining to the pump station and force main could be resolved via conditions of approval. It then suggested the following language to resolve this area of concern: "[The plaintiff], or its successor, will own and maintain the proposed pump station and force main, and will comply with an approved maintenance plan, with a performance bond or other financial guarantee of ongoing funding for maintenance. At any time, the town may request that ownership and/or maintenance responsibility be transferred to the [t]own or its designated entity, with appropriate financial or other guarantees. If, at any future time, a property owner, abutting east of the Cannondale railroad tracks seeks to tie into the sewer installed east of the tracks and connecting to Route 7, the [t]own may request transfer of ownership and maintenance to the [t]own and [the plaintiff] (or successor) will transfer as requested. [The plaintiff] suggests the above condition, but it will accept whatever ownership and maintenance program the [defendant] may require as part of an approval." (Emphasis omitted; internal quotation marks omitted.) The plaintiff further observed there should not be any problems with a new and properly maintained system but nonetheless proposed to enroll in the statewide "Call Before You Dig" program and to retain a private sewer monitoring company, approved by the town, to ensure that the system would operate without issue.

The plaintiff's January 18, 2023 letter also addressed the capacity issue. First, it noted that the 90 percent capacity was based on a theoretical flow, not the actual flow. Second, the defendant had not adopted a standard that 90 percent constituted an engineering risk. The plaintiff's letter also stated that the capacity standard

used in Norwalk operated as a trigger for a system review, rather than for a means to deny an application. Finally, the January 12, 2023 meeting was the first time the town had raised a concern regarding the 90 percent standard. In other words, the defendant could not "move the goalposts by now imposing a 90 [percent] design cap."

At the outset of the January 19, 2023 virtual meeting, it was noted that some, but not all, of the members of the defendant had been sent the draft resolution, contrary to the statements made at the conclusion of January 12, 2023 meeting. The chairperson then read this resolution, and it was approved unanimously. At this point, the plaintiff's counsel was allowed to speak with the members of the defendant. He indicated that he had not been provided with a draft of the resolution prior to the start of the meeting or allowed the opportunity to speak prior to the vote denying the application. The plaintiff's counsel also indicated that it was unclear whether his January 18, 2023 letter had been considered. The defendant's counsel disputed some of the assertions made by the plaintiff's counsel and concluded by stating that "[t]he only thing left to do was to vote on a resolution." The chairperson indicated her agreement with the summary of the events as recounted by the defendant's counsel.

Thereafter, the plaintiff appealed the defendant's decision to the Superior Court. After the parties submitted their briefs, the court issued its memorandum of decision on May 24, 2024, in which it sustained the plaintiff's appeal. In its analysis, the court first concluded that the defendant's findings were not supported by substantial evidence. Specifically, the court stated: "In reviewing the resolution adopted by the defendant, which sets forth its findings and reasons for denying the plaintiff's application, irrelevant and undisputed facts are presented as findings, while other facts are inaccurate, misleading or incomplete, and still others are statements of opinions as factual findings, without any refence to authority or any other basis in fact. Thus, the court cannot conclude that any of the findings or reasons are supported by

substantial evidence . . . .” (Internal quotation marks omitted.)

Relevant to the issues on appeal, the court determined that, due to the passage of time, the 2011 approval for the Cannondale Village development had lapsed. The court explained that the defendant’s regulations did not specify the length of time that an approval for a sewer connection remained valid. “In the record, the defendant did not articulate whether the 2011 approval was still valid, had expired or had been revoked. The town engineer informed the defendant that he had to include the 2011 approval in the capacity calculation . . . but the defendant’s counsel stated that the defendant must review it again, should the owner ever seek to pursue it.” (Citation omitted.) Later, the court explained the “plaintiff’s calculation of capacity of the pipe, when initially submitted as part of the application in September 2022, was already significantly overstated because its starting point was a calculation already reflecting staff’s input to inflate it from the previous application.” Specifically, the allocated use from the Cannondale Village project, which was never completed after its approval in 2011, was included in the capacity calculation. “*Therefore, removing the entirely hypothetical allocation for Cannondale Village, the flow proposed by the plaintiff for its development added to the actual flow from the assisted living facility would be . . . 0.435 cfs, which is 58 percent of the pipe’s capacity, far less than 90 percent.*”[21] (Emphasis added.) On the basis of what the court concluded to be a “grossly inaccurate calculation of capacity,” it further determined that the defendant’s finding that future developments that required access to the pipe in Route 7 would be precluded, in the absence of significant improvements, was flawed and speculative.

The court further determined that the record was devoid of any evidence regarding the capacity of the

[21]The court also questioned the inclusion of the allocated use, rather than the actual use, from the assisted living facility in the defendant’s capacity calculation.

entirety of the town sewer system and that the calculations from LandTech demonstrated that sufficient capacity existed with respect to the plaintiff's proposed redevelopment, with availability remaining for other connections. It also observed that the town did not have a policy or regulation for either a limit on capacity or a reserved amount for capacity for the future.[22] It then noted that members of the defendant appeared to have misapprehended the statements regarding the issue of pipe capacity, stating that "it must be observed that full and responsive information was not presented by the town engineer in response to the defendant's questions."

Next, the court addressed the findings and conclusion of the defendant with respect to the ownership of the pump station and the force main. It began by noting that the letters from the town engineer and Wright-Pierce do not state or refer to any existing policy of the defendant regarding ownership of the pump station "because the defendant has not articulated any policy on this topic that was either public or ever shared with the plaintiff or its engineers." Further, although some engineering opinions were expressed in these letters, such statements were not supported "in terms of or in reference to any known or expressed policy, or objective standard, and not backed by reference to any policy documents or even to any authoritative or industry standard. Some of these opinions were also inconsistent with opinions the town engineer had earlier and even later expressed . . . ." Finally, these opinions were contrary to the past practices of the defendant.

The court further concluded that the opinion of the town engineer that the pump station and the force main

---

[22]This court observed in *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, supra, 193 Conn. App. 823, that the "existence of an officially promulgated policy . . . was not essential in order to justify the position taken by the [water pollution control authority]." Id., 841. We further recognized that the town had a practice of refraining from granting conditional approvals and therefore acted in accordance with its usual practices and procedures. Id. In the present case, there was no such evidence of the town's past practices with regard to capacity issues.

should not be owned by different entities lacked support in the record. The court explained that the town engineer did not support his view with reference to "any sewer engineering best practices or authorities, or his own experience, training or knowledge, to support his characterization that it is bad practice. Moreover, his unsupported opinion was contrary to the opinion, views and experience of LandTech, of counsel for the defendant, of counsel for the plaintiff, and the past practice of the defendant in making such agreements. Thus, the record does not contain substantial evidence to support the town engineer's opinion." (Internal quotation marks omitted.)

The court then determined that the defendant's stated reasons for denying the plaintiff's application also were not based on substantial evidence. First, it addressed the defendant's statement that the town should not own a pump station that serviced only one property. Initially, the court described this reason as a statement of opinion from the town engineer, mentioned for the first time at the January 12, 2023 meeting, that characterized such ownership as a "'bad practice'" or "'bad policy.'" The court further explained: "[T]his reason is not supported by any evidence, either anecdotally from the town engineer's experience, or authoritatively, from any recognized treatise or manual. [The town engineer] even acknowledged that the defendant in the past has allowed such a situation to occur, on at least one property, which he did not identify or explain, giving no reason other than personal disapproval. This reason is also factually incorrect as the plaintiff did not propose that the town own the pump station while it served only the property, at least unless [the town] wanted to do so. What was under discussion and seemed resolved between [LandTech and Wright-Pierce] prior to the January 12, 2023 meeting was that the pump station would be privately owned but built to town specifications, and so as to be separate and severable from the plaintiff's property in the event the town decided to take ownership as when another property owner connected. This was always a position that was acceptable to the plaintiff. It was also proposed that

this arrangement would be subject to an explicit written agreement, secured by a cash bond, setting forth the plaintiff's obligations and the town's right to intercede, if needed, with indemnity assured."

Turning to the second reason for the defendant's denial of the plaintiff's application, that the plaintiff should not own the force main, the court stated it was not a valid basis for denying the application because it constituted a statement of policy that had not been previously articulated by the defendant. Additionally, the court noted that the plaintiff had agreed that the town should own the force main, which was located in the public road. Finally, it stated that this reason was contrary to the defendant's prior practice.

Next, the court addressed the third reason set forth for denying the plaintiff's application, that the force main and pump station should be owned, operated, repaired, and maintained by the same entity and, therefore, the plaintiff's application should not be approved until the pump station served more than a single property and was owned by the town. The court again noted that this reasoning amounted to a statement of new policy that had not been previously articulated by the defendant. Furthermore, it was unsupported by evidence and was contrary to the defendant's prior practice and, therefore, it was not a valid basis for denying the plaintiff's application.

With regard to the fourth reason for denying the plaintiff's application, that the plaintiff's application precluded any other development that would require access to the Route 7 sewer line because its capacity would have been reached, the court first indicated that this statement was factually incorrect and not supported by substantial evidence. "No evidence was presented of a policy or practice of the defendant regarding 90 percent capacity as either indicating full capacity or as barring approval. Further, the defendant stated in its deliberations that its vote on the plaintiff's application would be the first statement of such a policy." The court

also reasserted its determination of the flawed nature of these capacity calculations, namely, that "the evidence showed [that] the pipe would be capable of accommodating the plaintiff's proposed flows with nearly four times more than the 10 percent capacity remaining for future development."

As to the fifth reason for the denial of the plaintiff's application, that it was inequitable and unfair to other property owners who would seek approval to connect to the sewer in the future, the court simply concluded that reasoning was speculative, not supported by the evidence, and contrary to past practices of the defendant.

The court then explained why, in its view, the defendant's decision was arbitrary and an abuse of its discretion. The court stated, inter alia, that the defendant was not permitted to rely on inaccurate capacity calculations and to summarily accept the opinion of the town engineer that the plaintiff's proposed use would pose a danger or threat. "Because the defendant's denial was based on these flawed reasons . . . it was an arbitrary decision, made without adequate determining principle and without reason. *United States* v. *Carmack*, [329 U.S. 230, 247, 67 S. Ct. 252, 91 L. Ed. 209 (1946)]." (Internal quotation marks omitted.) The court further remarked that the denial of the application was based on "'indefensible reasons.'"

The court further explained: "The evidence demonstrated that the defendant in 2011 approved extension of the sewer and a connection for Cannondale Village . . . to run up Cannon Road, past the plaintiff's property, and to connect to the eight inch sewer pipe along Route 7, with estimated flows that exceeded what the plaintiff proposed. The developer who received the approval did not build the sewer extension or pursue its redevelopment plan, and the approval has not been revoked by the defendant or repudiated by the developer. [The defendant does not] address how long an approval is valid, and even the defendant's counsel stated that the defendant would require updating and a new approval. This absence of

any stated regulation or engineering reason why the plaintiff's proposed use, in the same design, covering less area and with less flow than what was previously approved, is not still suitable, for one that was previously approved but effectively abandoned, leads the court to conclude that the defendant's denial is arbitrary." Despite the good faith alterations made by LandTech to the calculations regarding capacity, including the inclusion of nonexistent and theoretical flows, it was still shown that adequate capacity existed with regard to the plaintiff's application. At the January 12, 2023 meeting, the town engineer, for the first time, stated that 90 percent capacity posed a dangerous risk to the system and was not recommended and made efforts to persuade the adoption of a new policy limit of between 75 and 90 percent capacity. Finally, the court stated: "Inexplicably, when asked by a member whether the defendant's regulations allowed it to address the need for upgrades and to impose the cost on users, the town engineer did not explain the nature of the defendant's authority as per its regulations but said simply that's a policy issue that you all have to vote on tonight. . . . The numerous comments that followed from members expressing worry and fear . . . demonstrate that they had adopted his opinion on capacity and did not understand either the factual issues about capacity or their authority under the regulations to upgrade the eight inch pipe. In sum, it was arbitrary for the defendant to deny the application based on the town engineer's unsupported opinion, instead of the uncontroverted expert testimony, including that of its own consultant, that the pipe had sufficient capacity to accommodate the plaintiff's proposed flow. . . . The 90 percent capacity figure in LandTech's final calculation, based as it was on theoretical and exaggerated numbers, is without adequate determining principle and without reason . . . or for indefensible reasons." (Citations omitted; internal quotation marks omitted.)

Furthermore, the court observed that the defendant did not determine that any portion of the application was incomplete or did not comply with the defendant's

regulations. "Nor did the defendant cite any aspect of the plaintiff's design and engineering for a force main and pump station that does not comply with sound engineering principles and practices for a sewer extension. . . . The defendant allowed the town engineer during the January 12, 2023 meeting to assert his unsubstantiated fears and did not press him to answer members' questions about the defendant's regulations to address capacity concerns and upgrades. If these questions [had] been answered, or if the plaintiff had been allowed at the final meeting, as the defendant agreed, to address them at the next meeting, the outcome may have been different or at least the record would indicate that the defendant had all the information to make a decision that would not have been based on ad hoc policies and a grossly exaggerated capacity conclusion. Because the record lacks full and accurate information, the court holds that the defendant's decision was fundamentally arbitrary." The court also addressed the reasoning of the town engineer. The court described his reasoning—that the pump station should be privately owned if it serviced only one property, the pump station and the force main should be owned by the same entity, but the town should own the force main—as circular and nonsensical.

As a final matter, the court agreed with the plaintiff that the defendant's conduct at the January 19, 2023 meeting lacked fundamental fairness. After recounting the events, starting with the end of the January 12, 2023 meeting, the plaintiff's submission of its January 18, 2023 memorandum, the failure to send the draft resolution to the plaintiff's counsel prior to the January 19, 2023 meeting, and the events of the January 19, 2023 meeting, the court concluded that the "defendant made a conscious choice not to honor its agreement with the plaintiff to share and to review the reasoning urged on the defendant by the town engineer in the lengthy prior proceeding, and to allow further comment from the plaintiff before making its decision. Additional factors about the defendant's conduct that are recognized as legally significant include that the agreement was

on the record, explicit, and articulated in the presence of the defendant by its counsel and that its timing was critical as it was the end of the statutory time in which the proceeding was required to conclude."

The court further noted that "[t]he interests of the plaintiff in [this] matter, at all times in its application, and especially at the last meeting on January 19, 2023, were substantial. *The defendant led the plaintiff to understand that it would then be heard on the new objections made by the town engineer, previously not expressed in earlier communications with the plaintiff or its consultants, and to respond to the comments made by the defendant's members who essentially adopted the town engineer's objections.* . . . In addition, comments from members on January 12, 2023, about worries about 90 percent capacity . . . demonstrate that they did not understand the issues or their authority under the regulations to upgrade sewer pipe capacity. As explained, these issues were based on speculation and inaccurate facts, especially as the 90 percent figure derives from theoretical flows that were required to be added by the town engineer but were unrelated to the plaintiff's property. . . . Considering this, the defendant's refusal to comply with the terms of the agreement of the January 12, 2023 meeting to give the plaintiff the opportunity to address new information at the January 19, 2023 meeting was not minor and in fact caused prejudice to the plaintiff. Consequently, it cannot be said that the defendant's conduct was an exercise of reasonable discretion in the conduct of its meeting. *Rather, the defendant's conduct constituted a blatant disregard for fundamental fairness and is addressed here so that it will not be repeated in the future.*" (Citation omitted; emphasis added.)

Having set forth our detailed summary of the events before both the defendant and the Superior Court, we now turn to the issues raised on appeal. The defendant first argues in its appellate brief that its decision to deny the plaintiff's application with respect to the issue of pipe capacity was reasonable and supported by substantial

evidence in the record. Specifically, it points to the evidence from Wright-Pierce and the town engineer that the plaintiff's proposed development would bring the Route 7 sewer main to 90 percent capacity. The defendant also contends that its denial of the plaintiff's application was proper based on the statements of the town engineer that 90 percent capacity constituted full capacity and that future projects in that area would be precluded. Finally, it asserts that its decision to credit the opinions of the town engineer and Wright-Pierce was proper given the broad discretion afforded to such entities under our statutes and case law. For these reasons, it claims that the court improperly exceeded its "limited" role by failing to afford proper deference to the defendant in sustaining the plaintiff's administrative appeal. We are not persuaded.

As a general statement, we agree that water pollution control authorities, when performing administrative functions such as considering applications for sewer services, are subject to limited review by a court. *Landmark Development Group, LLC* v. *Water & Sewer Commission*, supra, 184 Conn. App. 316–17; see also *Forest Walk, LLC* v. *Water Pollution Control Authority*, supra, 291 Conn. 282–83. Simply stated, "[i]t is well settled that a municipality has wide discretion [although not absolute] in connection with the decision to supply sewerage." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 423, 853 A.2d 497 (2004). Despite this deferential standard, however, reviewing courts do not merely serve as a "rubber stamp" of agency action, and we "cannot take the view in every case that the discretion exercised by the local . . . authority must not be disturbed, for if it did the right of appeal would be empty . . . ." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 854, 937 A.2d 39 (2008); see also D. Merriam, 9A Connecticut Practice Series: Land Use Law and Practice (2026 Ed.) § 33:12, p. 352. After carefully reviewing the record in this matter, we conclude that the

calculation of **90** percent capacity was not supported by substantial evidence and, therefore, the court properly concluded that the defendant's decision to deny the plaintiff's application on capacity grounds was rendered in an arbitrary or discriminatory fashion. See *Forest Walk, LLC* v. *Water Pollution Control Authority*, supra, 287.

LandTech, as a part of the plaintiff's application, prepared a capacity calculation that included the estimated flow from the plaintiff's redevelopment of 80 gpm, or 0.175 cfs, the actual measured flow of 115.3 gpm or 0.26 cfs from an existing assisted living facility, and the estimated flow from the 2011 proposed, but never built, Cannondale Village of 80 gpm or 0.175 cfs. If, however, allocation for the proposed Cannondale Village was not included, the flow totaled 0.435 cfs, which is only 58 percent of the pipe capacity, not the **90** percent used by the town engineer and the defendant as a basis to deny the plaintiff's application. At the November 3, 2022 meeting, the chairperson of the defendant inquired as to why the proposed Cannondale Village allocation from 2011 was included in the plaintiff's application. The town engineer responded that, in his opinion, because the Cannondale Village had been approved, albeit approximately ten years earlier, that amount was required to be included in the capacity calculation for the plaintiff's proposal. Counsel for both the plaintiff and the defendant opined that the approval for the Cannondale Village development no longer remained valid. The chairperson of the defendant requested further clarification[23] as to the question of whether the 2011 approval of the Cannondale Village remained valid but commented that there likely was no obligation to include that allocation in the capacity calculation when considering the plaintiff's application.

As part of its findings, the defendant stated that, if the plaintiff's proposal were approved, it would bring the capacity to **90** percent. This percentage appeared to

[23]The court noted in its memorandum of decision that "[t]he record does not indicate that the question of the validity of the 2011 approval was ever answered or that the approval was ever extended or transferred."

cause great concerns among the members of the defendant. One member remarked that she was "stuck on the 90 percent" while another stated he was "not favorably disposed . . . because to me 90 percent . . . doesn't feel like an appropriate level of expectation for that sewer line." Another member commented that "I'm more worried about the 90 percent from the present perspective . . . because I have a huge concern with like climate change and just the weather and 90 percent . . . seems so high. It just doesn't leave much room for error." In its reasons for denying the plaintiff's application, the defendant explained, inter alia, that capacity of the existing Route 7 main line would be reached, which would preclude any other developments that required access, and that it would be unfair and inequitable to other property owners who may seek approval to connect to the sewer.

In rejecting this basis for denying the plaintiff's application, the court reasoned that the approval for the 2011 Cannondale Village project had been abandoned due to the passage of time. It further explained that nothing in the regulations specified how long such approval remained valid, and nothing in the record demonstrated its current validity. The court indicated that "removing the entirely hypothetical allocation for Cannondale Village, the flow proposed by the plaintiff for its development added to the actual flow from the assisted living facility would be 115.3 gpm + 80 gpm = 195.3 gpm or 0.435 cfs, *which is 58 percent of the pipe's capacity, far less than 90 percent.*" **(Emphasis added.)** Adding in the 0.01 cfs amount for inflow and infiltration as agreed by the parties would not appreciably increase the pipe capacity calculation. In conclusion, the court determined that the determination of the 90 percent calculation was "based on a grossly inaccurate calculation and, thus, cannot be credited as substantial evidence to support the defendant's denial."[24]

We agree with the reasoning set forth in the court's decision. The record lacks substantial evidence that the

[24]The flawed pipe capacity calculation also impacts the defendant's finding that future developments would be precluded from accessing the Route 7 sewer main without significant improvements.

proposed use from the approved but never constructed 2011 Cannondale Village should have been included in the calculations to determine the pipe capacity. Counsel for both parties indicated that, or at least questioned whether, due to the passage of time, the amount allocated for the Cannondale Village project should have been included in the capacity calculation for the plaintiff's application. The plaintiff's counsel, and its engineering expert, indicated that they included this amount only in an abundance of caution and to provide the defendant with a conservative calculation. Although the town engineer stated that, in his opinion, he was required to include any approved development, he offered no support or basis for this conclusory statement regarding how long the 2011 approval remained valid. See, e.g., *Winsor* v. *Commissioner of Motor Vehicles*, 101 Conn. App. 674, 689–90, 922 A.2d 330 (2007) (record did not contain substantial evidence that driver refused to submit to breath test where evidence did not provide any information about circumstances supporting that conclusion); *Bialowas* v. *Commissioner of Motor Vehicles*, 44 Conn. App. 702, 716, 692 A.2d 834 (1997) (record lacked substantial evidence that driver refused breath alcohol test in case where police officer's conclusory opinion that driver did not blow with sufficient force into machine did not have underlying stated factual basis); see generally *Clifford* v. *Planning & Zoning Commission*, 280 Conn. 434, 455 n.12, 908 A.2d 1049 (2006) (recognizing that circumstances exist where conclusory statement made by single individual may not constitute substantial evidence); see also *Loring* v. *Planning & Zoning Commission*, 287 Conn. 746, 789–90, 950 A.2d 494 (2008) (*Norcott, J.*, dissenting) (commission could have disregarded conclusory statements from attorney who was responsible only for zealous representation of his client's application rather than impartial enforcement of zoning ordinances).

The town engineer's inclusion of the flow from the Cannondale Village project artificially inflated the capacity calculation to 90 percent but was not based on the

evidence in the record. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 435–36, 941 A.2d 868 (2008) (evidence did not support commission's determination that traffic survey was not done at site or that its calculations regarding peak traffic flow were accurate and correct); cf. *R. B. Kent & Son, Inc.* v. *Planning Commission*, 21 Conn. App. 370, 375, 573 A.2d 760 (1990) (higher release rate of water runoff was within engineering accuracy tolerance and thus there was evidence to support interpretation of calculations). This 90 percent level constituted a significant, if not the primary, concern raised by the defendant's members during their discussion of the resolution denying the plaintiff's application. Simply stated, "[a]n agency decision must be based on reliable evidence made public and the applicant must have an opportunity to respond to agency concerns." (Emphasis omitted; internal quotation marks omitted.) *Strong* v. *Conservation Commission*, 28 Conn. App. 435, 440, 611 A.2d 427 (1992), appeal dismissed, 226 Conn. 227, 627 A.2d 431 (1993).

Our Supreme Court has instructed that, in an appeal from the decision of a water pollution control authority, "we review the record to ascertain whether it contains such substantial evidence and whether the decision of the defendant was rendered in an arbitrary or discriminatory fashion." *Forest Walk, LLC* v. *Water Pollution Control Authority*, supra, 291 Conn. 287. In the present case, the defendant's decision regarding capacity was not based on reliable evidence. Rather, the defendant acted in an arbitrary manner or abused its discretion by using this inaccurate and unreliable data as a reason for denying the plaintiff's application. For these reasons, we conclude that the court did not act unreasonably, illegally, or in an abuse of its discretion when it sustained the plaintiff's appeal as to the issue of pipe capacity. See id., 285; *Landmark Development Group, LLC* v. *Water & Sewer Commission*, supra, 184 Conn. App. 317.

The defendant next argues that its decision to deny the plaintiff's application with respect to the issue of

the ownership of the pump station and force main was reasonable and supported by substantial evidence in the record, namely, the testimony from the town engineer. Specifically, it contends that the town engineer advised the defendant that the pump station and force main should be owned by the same entity, and that the town should not own a pump station that served only the plaintiff's property, and the plaintiff should not own the force main because it was in a public right of way and emergency maintenance would be problematic due to other public utilities located under the road. We conclude that the court properly determined that this reasoning was not supported by substantial evidence in the record. Furthermore, the plaintiff was not afforded a meaningful opportunity to address this issue, as the town engineer continuously shifted his concerns pertaining to the ownership and maintenance issues regarding the pump station and force main.

In his October 31, 2022 letter to the defendant regarding the plaintiff's application, the town engineer noted that it was proposed that a pump station on private property, in conjunction with a private force main, be used to discharge sewage from the subject property into the existing sewer system. Although he raised various matters that needed to be addressed, the town engineer, at this point in time, did not raise any issue regarding private ownership of the pump station or force main. The letter specifically noted, however, that the plaintiff would be responsible for any potential clogs and maintenance. The town engineer then sent another letter to the defendant, dated January 10, 2023. Therein, he noted that the plaintiff now proposed that the town own the force main while the pump station would remain under private ownership. Further, the plaintiff had suggested that the parties execute an agreement with a bond payment, subject to replenishment when needed, for maintenance purposes. The town engineer further stated that, on the basis of the proposed flow amount, he did not recommend that the town own and maintain the force main while the pump station was privately owned,

but if the defendant agreed to such an arrangement, then an agreement between the parties should be reached to define maintenance responsibilities. The town engineer did not offer any support, explanation, or reasoning for this position. He also appeared to be focused on ensuring that the parties reach an agreement as to all the potential issues regarding the pump station and force main before the plaintiff's application was granted.

At the January 12, 2023 hearing, a LandTech engineer represented that the plaintiff would accept whatever arrangement the defendant thought was best with respect to the ownership of the pump station and force main and the associated maintenance issues. In response, the town engineer emphasized his preference that an agreement regarding the specific maintenance obligations and duties be reached before the project proceeded further. The defendant's attorney indicated that such an agreement could be made as part of the approval process. Following the remarks of the town engineer, the plaintiff's counsel iterated that, "[w]hatever the [defendant] would like us to do on the ownership of the force main and the pump station, we will do whatever you tell us to do, including a bond, a performance bond, any of that stuff. We have no issue. We have no demand one way or the other. We will do whatever is asked of us." He also stated that "[a]n agreement on maintenance and responsibility for alarms and all that stuff to the satisfaction of the town staff and the town attorney and I've done dozens, if not hundreds of those in my career and so has [the defendant's attorney] and I'm sure have all the engineers . . . . The town is completely protected by a conditional approval because if we don't get to an agreement on these, what I'll call nitty-gritty, engineering issues, then the development does not move forward. But . . . if the suggestion is that we need a complete written agreement on engineering details before [the defendant] can approve the extension, the capacity and permission to connect, I would respectfully suggest that that is just not standard practice in any sense and I would bet that you have done conditional approval in that manner many times before." He further explained that

such a requirement would prove frustrating and require subsequent modification, as the redevelopment proposed by the plaintiff required multiple permit approvals at different land use agencies. After further discussion of other topics, the defendant's counsel indicated that "[t]here's no reason that an approval can't be conditioned upon an acceptable agreement to be negotiated. Obviously, it would have to be approved by whoever you decide it has to be approved by, but that happens often and especially in land use areas where there are private agreements . . . for easements or whatever it might be. Could be drainage, could be other things and the town has been a party to those—towns are party to those all the time. They're negotiated postdecision as a condition of approvals. I don't think that's [a] problem—from my perspective that's not problematic."

The town engineer reasserted his concerns about private ownership of the pump station while the town owned the force main. The town engineer then questioned if the plaintiff owned both the pump station and force main, how the plaintiff would be able to timely mark the underground utilities at the site of the force main and how the town would be able to perform repairs at the force main if the pump station was not maintained. The plaintiff's counsel iterated that it was not practical or realistic to address every possible scenario at this point and indicated again that the plaintiff would accept whatever terms the defendant, the defendant's counsel, or the town engineer required with respect to the maintenance and ownership relating to the pump station and force main.

After further discussion, the chairperson of the defendant directly asked the town engineer if there was a solution to the issues regarding ownership of the pump station and the force main. He replied that it was "bad practice" for the town to own the force main without also owning the pump station. He also repeated his view that the plaintiff lacked the ability to maintain the force main because it would not be able to mark other utility lines in a timely fashion. For the first time, the town engineer then indicated that the town should not own the

pump station that served only one property. The town engineer then explained that, if the pump station served two properties, the town could own the pump station and maintain it. The town engineer opined to the members of the defendant that they would, in effect, be voting on a new policy of whether the town should own a pump station serving only one property. He also indicated that he would not be able to respond to any responses from the plaintiff filed after the meeting. Nevertheless, at the end of the January 12, 2023 meeting, the defendant's counsel invited the plaintiff's counsel to respond before the defendant voted on the resolution.

The plaintiff accepted this invitation and provided additional comments in a letter sent to the defendant on January 18, 2023. Therein, the plaintiff again indicated that a written agreement regarding maintenance and responsibility would be drafted to cover all reasonably anticipated situations and to protect both the town and the defendant. Further, both the defendant's counsel and Wright-Pierce previously had agreed to the use of a written agreement as a condition of approval. The plaintiff also proposed that it would own the pump station and the force main and comply with an approved maintenance plan subject to a performance bond or other financial guarantee to provide ongoing funding for the maintenance. Further, the plaintiff offered to transfer ownership and maintenance responsibility at the town's request. It also iterated that it would accept whatever ownership and maintenance program that the defendant required. In response to the specific concerns that the town engineer had raised, the plaintiff noted that a new system, properly maintained, should not require service. Further, it proposed to enroll in a program with a large number of private contractors that would respond when any marking of underground utilities or pipes was needed, as well as employ a private sewer monitoring company that would respond to any maintenance issues, relieving the town employees of such responsibilities.

At the January 19, 2023 hearing, the members of the defendant immediately proceeded to discuss and vote

unanimously to approve the drafted resolution denying the plaintiff's application. Only then was the plaintiff's counsel allowed to speak at the virtual proceeding. He argued that, contrary to the representations made at the prior hearing, he was not allowed to present his comments, nor was he provided with a draft of the defendant's resolution prior to the hearing.

After careful review of the record, we conclude that the town engineer's opinion that it was not a good policy of the town to own a pump station that served only a single property was not supported by substantial evidence in the record. Specifically, the town engineer did not explain the basis for this opinion or offer any support for why public ownership was "bad policy" for a single property, but acceptable if two properties used the pump station. See, e.g., *Winsor* v. *Commissioner of Motor Vehicles*, supra, 101 Conn. App. 689–90; *Bialowas* v. *Commissioner of Motor Vehicles*, supra, 44 Conn. App. 716; cf. *Forest Walk, LLC* v. *Water Pollution Control Authority*, supra, 291 Conn. 292–98 (affirming trial court's determination that denial of application for sewer extension was proper where additional evidence supported testimony of consulting engineer). This was in contrast to the town engineer's views regarding private ownership of the force main and pump station, where he explained his concerns relating to the marking of the underground utilities and maintenance concerns. In the absence of such evidence, the court's determination to sustain the plaintiff's appeal was not arbitrary or an abuse of its discretion.[25]

Additionally, the defendant's failure to allow the plaintiff sufficient opportunity to respond to the town

[25]The present case is distinguishable from our decision in *Summit Saugatuck, LLC* v. *Water Pollution Control Authority*, supra, 193 Conn. App. 823. In that case, we concluded that the trial court improperly substituted its judgment for that of the water pollution control authority. Id., 841. In declining to grant a conditional approval, the water pollution control authority "explained that unknown and unforeseen problems potentially could arise between the time of approval and the completion of the sewer upgrades that could adversely impact the town." Id. The town in that case also had the usual practice of not using conditional approvals. Id. In the present case, there was no reasoning as to why the

engineer's newly raised concern regarding ownership by the town of a pump station that serviced only one property raised a question of the fairness of the proceedings. Over the course of the meetings before the defendant, the town engineer continuously changed his reasoning why the plaintiff's application should be denied with respect to the ownership of the pump station and force main. Initially, he stated it was because a specific agreement with respect to the responsibility for maintenance needed to be reached before the defendant approved the application. Next, he argued that the force main should not be privately owned and that the pump station and force main should be owned by the same entity. Finally, near the end of the January 12, 2023 meeting, he indicated, for the first time, that the town should not own a pump station that served only a single property. As our Supreme Court has recognized, a board such as the defendant must give notice of material facts that are critical to its decision to provide an entity adversely affected the opportunity for rebuttal at an appropriate stage of the proceedings. *Feinson* v. *Conservation Commission*, 180 Conn. 421, 428–29, 429 A.2d 910 (1980). Simply stated, the defendant's decision regarding ownership was not based on reliable evidence, nor was the plaintiff afforded the opportunity to respond to the concerns of the defendant. See *Strong* v. *Conservation Commission*, supra, 28 Conn. App. 440–41; *Kaeser* v. *Conservation Commission*, 20 Conn. App. 309, 314, 567 A.2d 383 (1989). We conclude, therefore, that the court properly determined that the defendant's reason for denying the plaintiff's application on the basis of the ownership and maintenance related to the pump station and force main was arbitrary and an abuse of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

town should not own a pump station that serviced one property, but it was acceptable if two properties were served by the same pump station. Nor was there evidence of a usual practice and procedure with respect to pump stations that serviced only a single property.